Appellant August Walter. Your Honors, and I'm sure you're familiar with the case, but by way of introduction, Mr. Walter sued his employer, BP America, for terminating his employment in retaliation for his complaints about BP's violations of environmental law during the aftermath of the Deepwater Horizon oil spill. Mr. Walter was the state planner for the Gulf of Mexico. He handled organizing and coordinating the resources needed for the cleanup, but he also supplied information to the Coast Guard by way of deep dive data, which would tell the Coast Guard what segments have been cleaned, what segments still had to be cleaned, what was not cleaned properly and had to be recleaned, and so forth. There was a constant battle between Mr. Walter and those in operations, particularly Mr. Corey Brown. It may not be clear, but that device right in front of you is the microphone, so when you scrape it with your paper, it's noticeable. I'm sorry about that. No, that's quite all right. It's effective in picking up all sorts of sound. Operations kept trying to pressure Mr. Walter to change the deep dive data that went to the Coast Guard. The Coast Guard would use the deep dive data to determine what still had to be cleaned and whether or not things were properly cleaned. There was a meeting on November 7, 2011, where Corey Brown of operations and a number of other people in operations tried to force Mr. Walter once again to change his data to the Coast Guard, saying that the cleanup had made more progress than it actually had. Mr. Walter refused to do that. There were also instances where operations actually changed the data and tried to falsify the data to the federal on-scene coordinator, which was the Coast Guard, to suggest that segments were cleaned that were not cleaned. On November 8, 2011, after the confrontation with Corey Brown and his refusal to change that data, Corey Brown contacted the vice president of operations, Carla Fontenot, and complained about that confrontation. On that date, November 8, that is when the investigation began of Mr. Walter that led to his termination on December 9, 2011. Now, the lower court agreed with the appellant on every aspect of the federal claim, except that it said the evidence that the discharge was a retaliation for refusal to change the data was weak. We have presented overwhelming evidence, especially in the reply brief. We've listed all of the documents that were presented by BP. We have emails, testimony, and whatnot showing that there was pressure to change the data. He refused to change the data. On November 8, after that confrontation with Mr. Brown, that is when the investigation started on Mr. Walter for that purpose, because of that meeting. So what whistleblowing activity did he engage in beyond what was part of his ordinary job duties? Because as I read the Louisiana case law, which is, I think, consistent with federal whistleblower statutes, if you're just preparing a report that you ordinarily do in your job, that's not whistleblowing activity. So, for example, if your client had called a member of Congress to say, boy, I've got to tell you what's going on at BP, that's whistleblowing activity because that's part of his job is not communicating with members of Congress. But here, as you just said, working on this data about which beaches have been cleaned, I mean, that was what he was hired to do. He was hired to do for BP, and he reported the failure to properly clean up to his supervisor, Mr. Cherari. Which is part of his job if the data was wrong. But it was not part of his job to report it to the Coast Guard or to the National Park Service. You're saying, where in the record does it say he reported it to the Coast Guard? Well, Lieutenant Montoya Delight was the federal on-scene coordinator with the Coast Guard, and the evidence shows that the meeting on November 7th was to be with the Coast Guard, where the Coast Guard was going to see this data and make some determinations on whether or not the cleanup was being properly done. And your client was – because I agree, he ordinarily didn't communicate with federal agencies. He would provide the data in someone else. What evidence are you talking about that he was going to convey this to federal authorities? Well, the evidence shows that he reported to his supervisor to no avail. He then started a conversation with the Coast Guard and the National Park Service about that problem. BP was aware of that. At one point, he quit. Walter's had a conversation with the Coast Guard? I'm sorry? Walter had a conversation with the Coast Guard? Walter went and reported to the Coast Guard. It may be there. Is it an affidavit, a deposition? What is it that says? Well, it's in a number of emails between him and the Coast Guard, and it's in his deposition testimony and in that long list of exhibits in the reply brief. We have arranged the exhibits and the evidence by topic, showing that here is where he constantly complained about not wanting to change the deep dive data and operations wanted him to change it. And then we have other segments where, for instance, other employees were guilty of infractions and there was no investigation on them, but there's an investigation on Walter. For example, you have Corey Brown, the guy who's in charge of operations and the main person trying to get him, forcing him to change the data, who's accused of insider trading on the open talk line. Mr. Corey Brown is accused of bragging that he's going to make a killing on BP stock once the cleanup is declared complete. No investigation of that. During the investigation of Mr. Walter, we also find that Derwin Henley of operations has been charged with similar behavior in terms of how he treats employees. There's been no investigation of that. So here he's being treated differently from similarly situated employees, but supposedly he's being investigated for reasons that are in the termination letter. Now, if you look at the evidence that we've provided, you'll also see that those reasons stated in the termination letter are not worthy of belief. They involve an employee of TRG named Amelia Peacock. He is charged with having inappropriate texting with Amelia Peacock. If you read the deposition of the investigator, she says that BP's lawyers actually put that conclusion in the investigation. She concluded that no sexting took place. And it's called S-E-X-T-I-N-G. I'm a little old. She concluded that this didn't take place. But in the process of BP constantly overlooking her investigation, changing her report, they decided to put that in the report. So you don't even have an independent investigation. Going back to one of the more preliminary issues, the Louisiana whistleblower statute says the plaintiff has to have a reasonable belief, a reasonable belief that an environmental law has been violated. It doesn't actually have to be a violation. The person just has to reasonably believe there was a law that was violated. What law or laws did your client believe were being violated by these slides that he thought were a mistake? The Louisiana Oil Spill Cleanup Act was being violated. Because the oil spill was so big, the Coast Guard comes in, and for all of the states along the Gulf, they act as the federal on-scene coordinator. You don't have the individual states by themselves trying to clean this up because it's so massive. Okay. The Coast Guard is also there by way of statutes that allow it to come in and enforce the cleanup. So if you present fraudulent data to the Coast Guard saying this is clean when it is not, you're committing fraud and you're cheating on the cleanup. You are actually not cleaning up the oil under the state statutes and under the federal authority that you are saying you're cleaning up. That's where the tension came in. He refused to do that because he was afraid that someday, after the cleanup is deemed complete, we're going to find tons of oil in the Gulf of Mexico, which, in fact, we have. Now, if we look at the case law that gives us the analysis to determine whether or not the termination was in response to the whistleblowing, they point out a number of things. For instance, is there a causal link between the protected activity and the discharge? The evidence shows that the vice president of operations and Mr. Erston, I believe his name is, he's the guy who was famous for saying, I want to go back to England and have a life. They had monetary incentives to declare the cleanup complete sooner rather than later. You have Corey Brown's insider trading saying that as soon as it's declared complete, I'm going to make a killing. In November of 2011, they got a new deadline for the cleanup, April 2012. That's when the pressure really came for Mr. Walter to change the data at that meeting. He refused. The very next day, November 8th, Corey Brown of operations, the inside trader, who BP also put in charge of the investigation, Walter with the investigator, called Carla Fontenot, the vice president of operations, who also has a monetary incentive to declare the cleanup finished sooner rather than later, and complained about that meeting. On November 8th, Mr. Walter then gets notification that he's under investigation. The results of the investigation are charging him with issues involving Amelia Peacock, who was employed with TRG. And the evidence on Amelia Peacock is laughable. First, no sexting took place according to the investigator, but BP is the one who changed that in the report. He's also charged with treating other employees disrespectfully and cursing. Corey Brown testified to the investigator that he never, ever heard Mr. Walter curse, and these are oil field workers, not to be disparaging, but, gee, come on. Okay? We think about the necessity of these events on a Louisiana whistleblower statute needing to occur in Louisiana, and your client was the Mississippi field operator. The list of documents that I have listed, especially in the reply brief, they show that he had responsible for the entire Gulf Coast. Also, the decision to fire him was in Louisiana. The meeting was in Louisiana. Doesn't the whistleblowing have to take place in Louisiana? The whistleblowing took place along the entire Gulf Coast, including Louisiana, because the Coast Guard was also located in Louisiana. This is where the hub of the operation was. And that meeting was in Louisiana. It was not far from here, in fact, where he was told to change the data, refused, and the very next day he's under investigation. So I would also ask the court to look carefully at the investigator's testimony. She testified that she would have wanted to talk to the Coast Guard. She mentions Lieutenant Delight by name, and she sends e-mails to BP asking, I'd like to talk to these people, because she testified when you're doing an investigation, it's better to talk to third parties to get another viewpoint. There are e-mails from BP saying don't talk to Lieutenant Delight. They controlled who she talked to. They said specifically you can get everything you need from the employees of BP. Yet there's another report that BP did where it is concluded that the employees of BP are not trustworthy. Why? Because Mr. Walter is a boy scout. He's doing this whistleblowing. He is creating what they refer to in that particular industry as noise, noise being this is not what we want to hear. You'll also see in there that Carla Fontenot instructs a BP employee to not take notes at the meetings that involve complaints about the cleanup. She actually says that. So we have that motivation shown that they are trying to hide the cleanup effort. They're trying to end it, declare it ended, sooner than later. They're cheating on the cleanup, especially with regard to, for instance, East Ship Island, Cat Island. In fact, they were looking at buying an island rather than cleaning it up. We have evidence listed where Mr. Walter tells the Coast Guard, and then other people complain, that they saw operations people from BP go out to these islands and not do the cleanup or decide to pick up, for instance, just quarter-sized tar balls and leave everything else. What do we have as a result? We've still got oil in the Gulf. This is what Mr. Walter was complaining about, and this is why he was fired. BP got their deadline of April 2012. Look what happened. So I just wanted to concentrate on that point because it is on that point that is the reason for the termination that the court granted the summary judgment. If the evidence is properly looked at, everything else will fall into place. One other thing I'd like to mention, the court, in its opinion, makes a statement as to what the investigator would have wanted to talk to the Coast Guard about. That characterization bears no resemblance whatsoever to the investigator's testimony. The investigator testified that it would have been helpful to talk to the Coast Guard because there may have been a motive by BP to have the investigation done because of the whistleblowing. She says that outright. Mr. Lawrence, why don't you pick up that point on your rebuttal? Thank you, sir. Hello. May it please the Court. Dick Schwartz for BP America. There are many reasons why the district court's grant of summary judgment was proper, and they are well covered by Magistrate Judge Wilkinson in his thorough and thoughtful opinion and in our brief. While Walter claims, makes state law claims with respect to fraud, intentional infliction of emotional distress and defamation, in essence the case is about whether Mr. Walter was actually terminated because he engaged in any protected activity, and he did not. He lost his job because of his behavior, which had nothing to do with any complaints which he was making, and I want to talk about that principally with you because what the evidence shows, contrary to what's been presented here in argument and in the brief, for which there is a complete absence of support in the record, is that Walter was investigated beginning in November of 2011, not because of the substance of a conversation he had with the deputy branch manager in his office, but because of the manner in which that conversation took place. Walter raised his voice, and this was against the backdrop of a history of problems with Walter's interactions with people. And so you had Corey Brown, who was this assistant branch manager who had the argument, reports it to his boss, Carla Fontenot, and then independently of that, a contractor calls Ms. Fontenot and says that he is concerned that Mr. Walter brought a contractor onto the response, that is, hired somebody into the response, who had been terminated for cause for failing to follow directives. And it was this that caused the investigation of Mr. Walter. It had nothing to do with any falsification of data or any pressure or anything of the sort. It is a little tricky, though, because that same conversation, he's disputing the slides, and then there's also this issue about his behavior during that meeting. The court below relied on the fact that BP, I guess Walter had resigned, and some BP employees went to him and said, no, we want you back, and they persuaded him to come back. But this big meeting happened after that. So, I mean, I'm not sure how much can we really rely on that. So here's the important point about that, Your Honor, and I'm glad you bring that up, because Mr. Walter says in his brief, and I believe it's at page 20, that when Corey Brown called Carla Fontenot to talk about the confrontation with August Walter, that Corey Brown didn't tell Ms. Fontenot what the argument was about. The complaint was that Augie had blown up, Mr. Walter had blown up, that he had acted in a degrading way towards Mr. Brown, that people in the office were afraid to talk around Mr. Walter, that they were feared for their safety, that they tried to manage it for a long time, and they couldn't stand another day. So if it's true, as Mr. Walter says in his brief, that the subject of the conversation was not related to Ms. Fontenot, and she started the investigation, then the investigation could not have begun because of any activity related to this deep dive. What, did Fontenot ever find out what the subject was and about him contesting these slides? Because I think you have to show that the decision maker knew of the whistleblowing protected activity. I'm sorry, say again? Is there any evidence that Fontenot ever knew about this dispute over the data in the slides? No. No. And, in fact, the whole thing about the slides is somewhat of a red herring for this reason. Mr. Walter claims that he was asked to change data in a slide, and he refused to do it. In fact, what the evidence shows is that he did have this confrontation with Mr. Brown with respect to the presentation of information in the slide, that then Mr. Walter sent the slides to a man by the name of Harrison, who was Mr. Brown's boss. He was the head of operations. And Mr. Harrison wrote to Mr. Walter and said, I don't understand your slide. And so Mr. Walter called Mr. Chaudhary, Mr. Walter's boss, and they had a conversation. In that conversation, Mr. Chaudhary told Walter, find out what Harrison wants. And significantly in that conversation, Mr. Walter never said, they're asking me to do something wrong, the data's false, it's a lie, it's improper, or anything like that. And so Harrison and Walter talk, and Walter changes the slide. He doesn't refuse to change the slide because it's false. He changes the slide and sends it to the people who get it, sends it to Mr. Harrison and says, thank you for the clarification. I believe the slide now reflects what you're looking for. He didn't say, which is something you would expect, that I'm sending this to you, but I'm telling you it's wrong, it's false, this is the wrong thing to do. He never said that. He never said that to anybody. One of the problems here is that you're talking about the evidence that supports BP's viewpoint. I'd be surprised if you were saying anything to the contrary. But this is summary judgment. And there's other evidence from Mr. Walter about what was said at the initial meeting. You said this fleshes it out and makes everything all right. Let me ask you about some other evidence. Mr. Lawrence said up here a few minutes ago that there are e-mails and perhaps other evidence that would indicate that he went outside of BP, that he contacted the Coast Guard or otherwise about matters that might be characterized as whistleblowing. What's your response to that? There's no evidence, Your Honor. What's in the e-mails that he's talking about? The e-mails that he's talking about relate to whether or not the work is following the plans or not. And they're not complaints. So as you pointed out, Your Honor, part of Mr. Walter's job, a big part of his job, was compliance. He was a planner. He was in the planning section on the BP side and in the response side. They had this dual organization. You had the Gulf Coast Restoration Organization, which was the BP side, and the Incident Command System, which was the incident side. And he had roles in both. So he had reporting to people in both organizations. And the Coast Guard was in this incident command part of it. He made plans, which were created pursuant to something called shoreline treatment recommendations, incident action plans, and branch action plans, which talks about endpoints and resources, communications, and all the things that would go into how the response was to be conducted. And so you had these plans, which Mr. Walter created, which were schedules. And because this was dynamic, the operations went out and the tide might be different or the weather might change or they found more oil in one place than another or any number of things caused the work to not go always in accordance with the plans. This was very frustrating to Mr. Walter. So the e-mails that Mr. Lawrence, Walter's counselor, is talking about, simply relate to whether BP is complying with these plans. There's not a single e-mail that references any complaint by Walter of any violation of any law to the Coast Guard or anybody else. The slides that would have been presented to the Coast Guard, reading the evidence in light most favorable to the non-movement movement, Mr. Walter, that may have constituted whistleblowing to the Coast Guard. If a would-be whistleblower is stopped from blowing the whistle by the employer, is there any case law that he still is entitled to fall under the statute? I don't think so. I don't think we get to whistleblowing with respect to the slides either. But I'm sure factually you disagree with the concept. But accepting the facts as I put them, what is the case law interpretation in Louisiana whistleblowing, which really would mean federal whistleblowing statutes, on an effort that was hindered by the employer? It has not previously been raised that BP in any way hindered the employee in a whistleblowing activity because that has not been part of our case. So I can't answer the question because I'm not prepared to address it today. What happened here was Mr. Walter didn't complain. I mean, he did not disclose or threaten to disclose an activity, which he reasonably believed was a violation of environmental law in connection with the deep dive report or the deep dive slides, which, by the way, were not false. So that's another thing about the deep dive slides. The difference between the slides as they ended up and the slides as Walter initially prepared them was simply whether or not the slide reported that a certain number of segments or areas of land needed to continue to be cleaned or had been cleaned. And Mr. Harrison wanted to show the number that had been cleaned, and Mr. Walter wanted to include in the slide not only the ones that had been cleaned but needed to be continued to be cleaned. So there was no falsity in the first place. And this is recounted in BP. In any event, though, didn't he agree not to include the slide? No. No, sir. So that's – Hold on. I mean, yes or no? Mr. Walter – He did agree not to include the slide, right? No, Your Honor. Oh, he didn't? No, so that's my point. He didn't state it. We have too many negatives here. I'm not sure. Yeah, let me try to thank you very much. Judge Gibson used to always tell me don't use pronouns and, you know. I thought it was a friendly question. That's why I was wondering if you understood. It's a friendly question but an honest answer, so we'll see. So he didn't agree. He insisted on showing that slide even though he was requested that that's not the story that we want to tell. He insisted that that slide, the way he had it, be presented to the Coast Guard. No, Your Honor. I've got two conflicting answers. Well, we won't get the full story. Once you've told me yes, I want you to – Let me clarify. Okay. Mr. Walter prepared a draft of a slide which had a presentation that Mr. Walter proposed. Mr. Harrison wanted the slide in Harrisons and Operations to show a different information. I understand. Walter changed his slide to accommodate what Mr. Harrison requested. So he did change it? He did change it. Okay. So he wasn't insisting on whistleblowing or that's – okay. My point exactly. He never said – he never – I understand your explanation. I don't understand that to be your first answer. Okay. That's consistent with the way I understood the record. Well, then I'm sorry if I was unclear. That's all right. And what Mr. Walter was doing, to follow up on what you were saying, Judge Costa, is his job. His job was the compliance function. He was to look at the plans, see if the plans were followed, and then write variances. There were daily variances, weekly variances, monthly variances. And it was his job in both with the Coast Guard and with the BP organization to track those things so that they could then be addressed. And ultimately – and this is an important point – it wasn't the deep dive presentation which determined whether a segment was clean or not clean. There was a completely independent group, something called the Shoreline Cleanup Assessment Team, or SCAT, which did multiple inspections of properties to determine whether it was clean. And then the federal on-scene coordinator, who was the top person, a Coast Guard person, would determine whether something met the requirements or not. And in the process, these deep dive slides were used strictly for situational awareness. They were not the record of what was clean or wasn't clean. It was a time when people sat down and go, where are we? What's happening? It was a very high level. The environmental section of the cleanup kept detailed records and photographs of everything that happened, who went where on what day. But while he helped prepare the slides, his job wasn't to go interface with the Coast Guard and present them to the Coast Guard. And so that's why I was asking if there's anything – and it's a massive record. That's part of the problem here. Whether there's anything in the record that shows he was planning to reach out to the Coast Guard or did reach out to the Coast Guard and say, let me tell you something, those slides are misleading or wrong or false. Nothing like that at all, Your Honor. Well, there's Planning Council saying there is. I guess, I mean, we just have to look through the record more closely and figure this out. And to Judge Wilkinson's credit, because the record below was very much like the record presented to you in terms of the briefing, he really spent an enormous amount of time going through the deposition testimony, trying to ferret out what is it that Mr. Walter is complaining about. And in essence, his complaint was BP wasn't following the plans and this deep dive. And then the district court meticulously addressed the evidence which was presented and whether or not it showed that BP terminated Mr. Walter because of protecting activity or because of Mr. Walter's conduct. And what the court found is that the investigation was started as a result of these two phone calls I mentioned, that BP hired an independent investigator to do the investigation who was an experienced employment lawyer, that she interviewed 18 witnesses, some more than once, that she wrote a report that they were her conclusions. And this whole argument that BP wrote the report to control the investigation is not supported by any evidence. Well, is there a conflict of any sort, getting back to what opposing counsel indicated, that, as I understood at least your position, that there was an addition made to her report about the sexting incident, but it was with her approval. Somebody read it, thought it wasn't as clear as it could be, and she agreed to add something. Are we talking about the same thing that opposing counsel was? So explain that just a bit to me. What happened? Who did what? Well, the evidence is that Ms. Martinez Vitella, the investigator, wrote up her report and had a discussion with legal, BP legal, and BP legal said, with respect to this sexting issue, would you be comfortable were the words that Ms. Martinez testified to, would you be comfortable saying that a sexting relationship was implied because Mr. Walter confronted somebody about viewing other texts between Mr. Walter and this contractor, Ms. Peacock, who was the one who was brought on to the response and who the complaint and the issues were about. Is what you just said the additional language that was put into the report? Yes. And that's the only thing. And Ms. Martinez Vitella said unequivocally that what she wrote in her report were her conclusions, based on her investigation, that she thought she did a full and complete investigation. This thing about Ms. Montoya, I'd like to address briefly, if I could, to Lieutenant Montoya of the Coast Guard, sat next to Mr. Walter in the office in Mississippi, and Mr. Walter was the state planning lead in Mississippi. That's where he worked, that's where his job was, that was his responsibility was Mississippi. And so the reason why the investigator said she wanted to talk to Lieutenant Montoya was because Lieutenant Montoya may have observed the argument between Corey Brown and Mr. Walter. It had nothing to do, there's no evidence, that the investigator wanted to talk to Lieutenant Montoya to understand anything about any whistleblowing or complaining activity by Mr. Walter. In fact, the investigator testified that Mr. Walter never told her in the hours that she spent with him that he was a complainer, that he was a whistleblower, that he had any problems in connection with being forced to falsify information or that the cleanup wasn't being done properly or anything of the sort. And none, not one of the 18 witnesses that the investigator talked to said that Mr. Walter was a complainer, a whistleblower, or there was any issue. So when we talked to Ms. Martinez and Votella in her deposition, she didn't know anything about Walter being a whistleblower. Because Walter had never said anything. And Ms. Martinez-Votella said, and in the end, after at the end of the interview with him, I said, here's my phone number. If you think of anything else, call me, let me know, and we can talk about it. But that wasn't the issue. All this stuff about I was forced to constantly falsify data and report it to the Coast Guard, there is no evidence of that. And that's why the district court's opinion is correct, because what the district court did was ferret through what the evidence actually showed and conducted an analysis of whether or not Mr. Walter actually showed any illicit motive by BP in connection with the termination. And the evidence showed that Mr. Walter was terminated because he was not truthful with human resources and the investigator in connection with Ms. Peacock, that he treated people badly in the office by degrading them and he was divisive and problematic. And that's why he was terminated. And so the district court concluded that Walter did not show that BP's articulated reasons were pretextual or that there was but-for causation. And for those same reasons, we're asking that you affirm the district court's grant of summary judgment to BP. Thank you, counsel. Thank you very much. Your Honors, with the conflicting characterizations of the evidence, I would just really beseech the court to look carefully at the evidence in the required brief. We've listed it. By topic, for instance, appellant refuses to falsify deep dive reports to the Coast Guard. This is something that had gone on for some time. It simply came to a head at that November 7th meeting because now there was a new deadline to declare the oil spill complete. We also present evidence that he received hostile treatment because he was complaining that the plans were not being followed. If the plans are not being followed, it means that the cleanup is not being properly done. We present the evidence showing that the investigation began on November 8th, right after the confrontation with Corey Brown on November 7th, about the deep dive issue. But, again, that is not the first time it came up. This was an ongoing problem, and this became a bigger problem for operations because we now had a new deadline. As to the conversation that Mr. Walter had with Mr. Brown, that conversation was about changing information to the Coast Guard, and he refused to do that. If his voice was raised, it was when he said to Corey Brown, you're not my boss because he was getting irritated with operations trying to tell him to commit fraud and falsify the data. We have also listed the evidence showing his responsibilities touched on all states. Another important thing, he was going to be in charge of the IMT transition. The IMT transition was moving the cleanup operation to a different level so that you can then immediately declare it complete. This is why they needed Mr. Walter on board. If this was also terrible, what BP was doing, even after he was fired, did he ever go to the Coast Guard or any other authorities and say, let me tell you everything BP is doing? I don't know what he did after. I don't know if he did any of that after he was fired. In fact, I didn't even discuss that with him. He was pretty much torn up by what happened to him. Right. He was upset enough to sue BP. I would think he'd also be upset enough to, if you had all these concerns, to go to the federal authorities or the state authorities and whistleblow. This is not part of the record, but after the motion of a summary judgment was granted, he continuously sent me e-mails with information showing that the cleanup had not been properly done. There was still oil there, so he was still very active. It's just that I don't know who he actually went to to discuss that. I just don't have that information. But that was all after the fact. The investigator's testimony is so crucial here. One point we need to look at. The investigator's deposition was not taken until after oral argument on the motion of summary judgment. Why? The investigator was first noticed as a deposition long before the oral argument was scheduled during the discovery period. She didn't show up. She didn't show up. She testifies in her deposition that she didn't show up out of concern for BP. She's a lawyer. She got notice. She intentionally did not show up out of concern for BP. She also complained that her investigating company had big problems with BP as a client, the biggest problems with BP as a client, because BP was always involved in the investigation, telling them who to talk to, how to conduct it, where to go, and, for instance, with the sexting incident, what to write. So this was hardly an independent investigation. Now, yeah, these were her findings based upon where BP told her to go and who to talk to. So this was not an independent investigation, and she says that. The reasons in the termination letter hired a contractor with clear conflict of interest. That's Amelia Peacock. The record's going to show that Mr. Walter had no authority to hire Amelia Peacock. The record also shows, especially in the list I have here, that it was Derwin Henley who wanted Amelia Peacock rehired, not Mr. Walter. Lied to an investigator in HR regarding his knowledge of the contractor's prior separation. That's Peacock again. We have a long list of evidence here on why Peacock was fired or why she was going to be hired. Everybody was confused. HR didn't even know. Mr. Walter gave his opinion. His opinion was that TRG wanted her out of the way to hire someone else. That's not lying about that. Failed to treat employees. Mr. Lawrence, you're making a very able presentation, but your time is up. Oh, I'm sorry. Thank you, sir. Thank you both for bringing this case to us. We are now in recess until tomorrow morning.